# EXHIBIT 1

Joseph J. Tabacco, Jr. (SBN 75484)
Kristin J. Moody (SBN 206326)
Alexander S. Vahdat (SBN 284963)
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: jtabacco@bermantabacco.com
         kmoody@bermantabacco.com
         avahdat@bermantabacco.com

*Local Counsel for Plaintiffs and the Proposed Class*

Patricia I. Avery (for admission *pro hac vice*)
Philip M. Black (SBN 308619)
**WOLF POPPER LLP**
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Email: pavery@wolfpopper.com
         pblack@wolfpopper.com

*Attorneys for Plaintiffs and the Proposed Class*

### SUPERIOR COURT OF THE STATE OF CALIFORNIA
### FOR THE COUNTY OF SAN MATEO

| | |
|---|---|
| ELIZABETH COPLEY and RACHEL CALCATERRA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATERA, INC.<br><br>Defendant. | Case No.  23-CIV-03095<br><br>**AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**1.  VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code §§ 17200, *et seq.*);**<br><br>**2.  VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code 1750, §§ *et seq.*);**<br><br>**3.  BREACH OF IMPLIED CONTRACT OR QUASI-CONTRACT;**<br><br>**4.  VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (Conn. Gen. Stat. § 42-110b(a)); and**<br><br>**5.  VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (Fla. Stat. § 501.204(1).**<br><br><u>**CLASS ACTION**</u><br><br><u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiffs Elizabeth Copley ("Copley") and Rachel Calcaterra ("Calcaterra") (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Natera, Inc. ("Natera" or "Defendant"), and allege on information and belief, except as to the allegations that pertain to Plaintiffs, which are based on their individual, personal knowledge, as follows:

## INTRODUCTION

1.      Plaintiffs bring this class action on behalf of all persons in the United States who had a "Panorama," "Horizon," "Vistara," or "Spectrum" test performed by Natera, and were then billed more than $249 for that test.

2.      Natera is a genetic testing company in San Carlos, California that offers a range of prenatal genetic testing services designed to screen for genetic abnormalities in the prospective parents or the fetus.  Through brochures and other communications with patients, usually via patients' medical providers, Natera represents that the out-of-pocket cost to patients for the tests will not exceed $249.

3.      However, despite these representations, Natera routinely bills patients several hundred or even thousands of dollars for its tests—much more than the $249 Natera promises. The list price for Natera's tests, which Natera does not reveal to patients in advance, is up to $8,000 per test.  Despite Natera's assurance that its tests are affordable and will not cost patients more than $249, Natera instead sends bills for much higher amounts to patients' health insurers and to patients directly, leaving patients on the hook for enormous bills that they did not expect to receive. Natera often bills patients many months or even years after the patient's testing took place, and for amounts well in excess of $249 (e.g., approximately $750, $1600, or even thousands more). Natera will send such bills even if Natera already received more than $249 from a patient's health insurer.

4.      Natera's deceptive, unfair, and abusive billing practices cause a substantial financial burden on new, expecting, and prospective parents, at a time when they are already feeling financially vulnerable.  Natera's billing practices have been widely panned on websites such as Yelp, Better Business Bureau, Reddit, and What to Expect.  For example, as of July 5,

2023, Better Business Bureau has 431 reviews and Yelp has 213 reviews, a majority of which are negative reviews that give the company a "1 star" rating. Similarly, a Reddit thread titled "How is this not fraud? – Natera bill" has 105 comments with people narrating their horror experiences with Natera's billing practices.  Over the years, the site whattoexpect.com has also contained several discussion threads titled, e.g., "Natera is a terrible company"; "Beware Natera Billing!"; "Natera Billing issues"; "Natera genetic testing bill $8000?!".

5.      When Copley was pregnant with her second child, her OB/GYN recommended a Natera genetic test (the "Panorama" test).  She was assured by her OB/GYN's office that the test would not cost more than, at most, $250. However, Copley later received an Explanation of Benefits statement from her insurer showing charges from Natera totaling $8,000 for the test. In response, Copley's husband called Natera, and a Natera representative told him that Copley would be charged $249 for the test, confirming the pricing that Copley had been told at her OB/GYN's office. Nevertheless, over a year and a half later, Copley received a bill from Natera for $721.10, and then received a second and a third bill from Natera for the same amount. After making one payment of $50 to Natera under protest, Copley then received a "final notice" bill dated October 24, 2021 for $671.10, due immediately. As is the case for all other members of the proposed class, the bills Copley received from Natera contradicted Natera's representation that its genetic tests would cost patients no more than $249, and charged grossly in excess of the reasonable value of the services rendered.

6.      Plaintiff Calcaterra viewed a Natera brochure at her OB/GYN's office prior to undergoing the Panorama and Horizon tests.  That brochure said: "If [Natera] estimate[s] your cost to exceed $249, we'll contact you and you choose how you pay: insurance or cash."  It also said: "If we estimate your cost to exceed $249 per test, we'll contact you to discuss cash pay options."  An insert inside the brochure further said: "If your insurance does not cover genetic testing, the non-covered service amount is $249."  Notwithstanding these representations, Natera later billed Calcaterra demanding payment of $749 for the Horizon test and a further $212.54 for the Panorama test.  Calcaterra called Natera and complained that the bills were more than Natera

1   had represented, but Natera refused to honor the $249 price.  Consequently, Calcaterra paid both

2   bills in full.

3          7.     The statement that Natera's tests would cost Plaintiffs not more than $249

4   originated with Natera in California.  Natera's business model relies on having physicians' offices

5   recommend Natera testing to patients. Natera then bills patients separately for the tests, without

6   communicating to patients the true amount that Natera will charge for the tests.  Natera decides

7   what it will represent as the charge for its tests, and then communicates that information to

8   patients, as well as to physicians' offices with the knowledge and intent that the information will

9   then be transmitted to patients.  As described in more detail below:

- The Natera brochure received by Calcaterra is distributed to patients through their physicians, and explicitly says that patients will have the option of paying a $249 cash price.

- Natera's bills have a section entitled "Who Is Natera?," showing that Natera knows that patients often hear about the company and its tests, including the price thereof, from their physicians, and not from Natera directly.

- Copley's former and current OB/GYNs had relationships with Natera through Natera sales representatives. Both of Plaintiff Copley's OB/GYN's offices were told by Natera representatives that Natera tests would not cost their patients more than, at most, $250.

- When Copley's husband called Natera, the Natera representative confirmed on the phone that Copley would be charged $249 for the test (even though Natera then billed Copley for more than twice this amount).

24          8.     Defendant's conduct with respect to billing for its genetic tests violates the

25   California Unfair Competition Law ("UCL"), the California Consumer Legal Remedies Act

26   ("CLRA"), the Connecticut Unfair Trade Practices Act ("CUTPA"), the Florida Deceptive and

27   Unfair Trade Practices Act ("FDUTPA"), and common law, which provides that in the absence of

28   an express contract, service providers are entitled to the reasonable value of the services rendered.

**PARTIES**

9.      Plaintiff Elizabeth Copley is a natural person who is a citizen of the United States and who, at all relevant times hereto, has resided and been domiciled in the State of Connecticut.

10.      Plaintiff Rachel Calcaterra is a natural person who is a citizen of the United States and who, at all relevant times hereto, has resided and been domiciled in the State of Florida.

11.      Defendant Natera, Inc. is incorporated in Delaware and operates one of its two major testing laboratories at 201 Industrial Road, Suite 410, San Carlos, California 94070. Defendant is a corporation that provides prenatal genetic testing services.

**JURISDICTION AND VENUE**

12.      This Court has subject matter jurisdiction pursuant to California Constitution Article VI, Section 10.

13.      This Court has personal jurisdiction over Defendant because Defendant is duly licensed, registered, and conducts business in the State of California, and a substantial portion of the conduct giving rise to Plaintiffs' claims took place in California.  The amount in controversy exceeds the jurisdictional minimum of this Court.

14.      Venue is proper in this Court because Defendant maintains offices, has agents, employs individuals, and/or transacts business in this jurisdiction; a substantial portion of the conduct giving rise to Plaintiffs' claims occurred in this jurisdiction; and Defendant caused harm to Plaintiffs and putative Class members from within this jurisdiction.

**FACTUAL ALLEGATIONS**

**Background on Natera**

15.      Natera specializes in providing genetic tests for pregnant women and prospective parents, particularly non-invasive prenatal testing ("NIPT") services. It offers several genetic testing panels with different brand names, including Panorama, Horizon, Vistara, and Spectrum. The Horizon and Panorama panels contribute a significant majority of the company's revenues

(and Natera has publicly stated that it "expect[s] this to continue to be the case"[1]). The company's other tests are currently primarily performed at Natera's San Carlos location.[2]

16.     Natera operates laboratories in Austin, Texas and San Carlos, California, both of which process the Panorama and Horizon tests. In the year ended December 31, 2020, Natera processed most of its tests in its San Carlos, California laboratory (*see* Natera's 2020 Form 10-K, retrieved from investor.natera.com, accessed February 22, 2022).  Natera's San Carlos laboratory and office space is apparently significantly larger than the laboratory and office space which Natera's subsidiary leases in Austin, and Natera's San Carlos laboratory is currently recognized by 48 U.S. states as a Medicaid provider.

17.     Natera's bills are sent from, and are payable to, California addresses, namely PO Box 399023, San Francisco CA 94139-9023, or PO Box 889023, Los Angeles, CA 90088-9023.

18.     Natera uses its San Carlos, California address and telephone number on test brochures, including brochures for its most popular tests, Panorama and Horizon.

19.     Natera uses its San Carlos, California address on test results.

20.     Natera directs patients and providers who have questions to call a phone number with a 650- area code (San Carlos and San Francisco Bay Area) to obtain answers, including within a Natera Billing Guide brochure.

21.     Based on the foregoing, Natera's billing policies and practices are established and managed from within California, and Natera receives patient payments in California.

**Natera's Deceptive and Unfair Billing Practices**

22.     Natera's billing policy and practices are deceptive and unfair. Natera sets the prices of its tests and determines the amount to charge insurers and patients for those tests, and also determines what to communicate to patients and providers about the cost of its tests. In so doing, Natera conceals that the list price for its genetic testing services is thousands of dollars,

---

[1] *See* Natera's 2022 Annual Report to Shareholders, at, *e.g.*, 29.
[2] *Id.* at 37 ("We currently operate laboratory facilities in Austin, Texas and in San Carlos, California, both of which process Panorama, Horizon, and Signatera tests, which together represent the significant majority of our revenues. Our other tests that we perform are currently only able to be performed at one, but not both, of our laboratories, and are primarily performed at our San Carlos location.").

depriving patients of the ability to make an informed decision about whether to undergo those tests. Instead, Natera promises patients, both directly and through marketing channels with medical providers, that the cost to patients will not exceed $249. Natera's billing practices are deceptive and unfair because Natera does not accurately disseminate crucial price information to patients and instead makes false and/or misleading statements about the cost of its tests.

23.     Natera fails to ensure that patients are made aware of its billing practices.  As a common theme, Natera fails to disclose to patients the extremely high price it charges for its genetic tests (approximately $8,000) and the fact that many insurance plans do not cover these tests, or do not cover portions of them. For example, Natera fails to inform patients that coverage for its tests might be denied as "experimental," and that while some insurance companies may cover the Panorama test, they may nevertheless consider the "microdeletions" add-on to that test as experimental, and deny coverage for that portion of the test (which Natera charges for separately). Since genetic testing remains a fairly new area of medical science and may not be fully covered by some insurance plans, disclosure of the full charge for the tests is especially crucial for patient decision making. Furthermore, where patients have not met their deductible or where their insurance denies coverage, the full $8,000 list price or the amount above what the insurance "allows" (which is often more than $500) becomes the patient's responsibility. Natera does not disclose to patients that Natera will bill them for the amount that their insurance deems the patient responsibility, whether or not it exceeds $249.

24.     Natera's website, brochures, and other marketing materials that purport to provide billing and pricing information are misleading and conceal crucial information, the disclosure of which would affect a patient's decision to undergo these tests. Natera recognizes that pricing information is fundamentally important to patients, but nevertheless provides false assurances that patients will not have to pay more than "our cash price" (i.e., $249).

25.     For example, a "Natera Billing Guide" brochure states: "If you've met your deductible, the average out-of-pocket expense is less than $249 . . . . If your insurance plan denies the claim, you will be eligible for our discounted cash price."  This brochure gives Natera's address in San Carlos, California.

26.     Additionally, as of February 22, 2022, on the "Pricing and Billing Information" page under the Women's Health category on Natera's website,[3] Natera stated that it offered "price transparency – rooted in [its] commitment to provide affordable testing for all who can benefit." Natera claimed to provide "clear cost estimates for patients" through a "Price Transparency Program," which includes four steps, namely: (1) "Medical provider orders a test. We start processing the patient sample." (2) "Natera billing issues an insurance estimate." (3) "If we estimate your cost to exceed our cash price, we'll contact you via text or email and you choose how you pay: insurance or cash." (4) "If you choose insurance, Natera billing issues an invoice to you once Natera reviews your health plan's confirmation of exactly how much you owe." As of July 5, 2023 and October 9, 2023, this same webpage contained materially the same information, stating that Natera provides "Personalized Cost Estimates" through its "Price Transparency Program (PTP)," whereby: "If you provide your insurance information, Natera reviews it and if we estimate your out-of-pocket cost to exceed our cash price, we will contact you to discuss alternative payment options."  This webpage also states that patients " can receive a personalized cost estimate for Panorama™, Vistara™, Empower™, or Horizon™ by texting us at 1-650-210-7046," a San Francisco Bay area code.  However, in practice, Natera neither runs insurance estimates for patients prior to billing nor contacts patients to give them an option to pay through insurance or cash. Instead, Natera surprises patients with huge bills.  Natera does not explain to patients that their out-of-pocket cost may exceed $249 if patients choose to utilize their insurance coverage, even if the patient's insurance has already paid that amount (or more) to Natera.

27.     Natera's bills will offer some patients a "prompt payment" deal to waive any charges above $249 if the patient pays within a limited time window—a high-pressure tactic that is designed to take advantage of patients and extract as much money as quickly as possible from them. This tactic also admits that the much higher, undisclosed list prices for the tests are unreasonable, have no relationship to the cost to provide the test, and are not what Natera expects to receive from patients. Patients who are not offered the $249 deal, or who do not respond in time, are billed for an unreasonably larger amount.

[3] www.natera.com/womens-health/pricing-billing/

AMENDED CLASS ACTION COMPLAINT

28.     Natera induces medical providers to provide misleading billing information to patients by failing to disclose its billing practices to providers, and instead informing them that the cost of its tests to patients will not exceed $249 (or $250).  As further alleged below, both Plaintiffs' former and current OB/GYN's offices had relationships with Natera representatives, who told the offices that the cost of Natera testing to patients would not exceed $250. As a result of Natera's marketing to healthcare providers, the providers themselves are given the impression that patients will not owe more than this amount for Natera tests, and convey this information to patients. Natera is aware that this misinformation about the cost of its tests is routinely communicated from providers to patients, and encourages these communications. While providers may pass along a price of $250 instead of $249 to patients, this is merely due to rounding, since the number that appears in Natera's written materials (e.g., billing and brochures) is consistently $249.

29.     Natera's bills to patients reflect Natera's awareness that patients may be hearing about Natera for the first time when they receive a bill from Natera. To wit, there is a section on the back of Natera's bills that reads: "Who is Natera? Natera offers non-invasive genetic testing services. Your physician is uncompromising in patient care and asked us to perform important tests on a blood sample collected during your office visit." It further reads: "Why did I receive a Natera Statement? You are receiving a statement/bill from Natera because genetic testing services were performed, on your behalf, at the request of your physician."

30.     In addition, Natera will also bill in-network patients exorbitant and improper charges. In these bills, Natera misleadingly claims that the patient's insurance did not cover the test, when, in reality, Natera failed to obtain required pre-authorization(s) from the insurer(s). Consequently, patients who should owe nothing for the test, or only a co-pay, are hit with a surprise bill stating that they owe much more than what they expected. Natera is aware of its obligation to obtain pre-authorization, but intentionally or recklessly does not obtain that pre-authorization. Natera's practice of billing in-network patients is an attempt to circumvent its pre-authorization obligations with insurers by improperly and fraudulently obtaining payment directly from patients.

31. Natera receives an economic benefit from billing patients, even before patients pay those bills. Specifically, Natera's bills generate a receivable asset for Natera.[4] If a patient pays the bill, that receivable asset is converted to cash.

32. Natera's bill represents an economic injury to consumers. Until such time as the bill is retracted, the bill is a liability to the patient (albeit a disputed one), and Natera could take imminent action in furtherance of the enforcement of that asserted liability (through, for example, sending the bill to collections or instituting other legal process).

**Experiences with Natera's Billing Policy**

Plaintiff Elizabeth Copley

33. For her second pregnancy, Copley received OB/GYN care from a physician's practice in New Milford, Connecticut.

34. Copley's experience illustrates Natera's symbiotic relationship with OB/GYN practices. Copley's practice has maintained a direct relationship with Natera whereby, at some point prior to late 2019, a Natera representative informed the practice that the out-of-pocket cost to patients for any Natera tests not covered by insurance would be $250. As expected, the practice passes this information along to patients on behalf of Natera, including Copley.

35. In late 2019, when Copley was pregnant with her second child, the nurse practitioner at Copley's then-OB/GYN's office advised her to do the Natera Panorama Non-Invasive Prenatal Testing panel ("Panorama panel") due to her age.

36. Upon specifically inquiring how much the test would cost, the nurse practitioner assured Copley that it would not cost more than $250, at most.

---

[4] *See* https://www.investopedia.com/terms/a/accountsreceivable.asp (accessed June 20, 2023) (explaining that "Accounts receivable (AR) are an asset account on the balance sheet that represents money due to a company in the short term. Accounts receivable are created when a company lets a buyer purchase their goods or services on credit. . . . An example of accounts receivable includes an electric company that bills its clients after the clients received the electricity. The electric company records an account receivable for unpaid invoices as it waits for its customers to pay their bills.")

37.     Copley has been told by her former OB/GYN's office that the information on the cost of the Natera test was based on statements and representations made to the OB/GYN's office by Natera's representative.

38.     Based on the pricing information that Copley's OB/GYN's office passed along to her from Natera, Copley agreed to get her blood drawn for the "Panorama Prenatal Screen with Microdeletions" panel (procedure codes: Fetal Chromosomal Aneuploidy with Microdeletions 81420HA, 81422HA) on October 22, 2019.

39.     Copley did not hear anything further about or from Natera until she noticed a charge of $8,000 on an Explanation of Benefits ("EOB") statement from her insurer, Connecticare, in late 2019 or early 2020. The EOB was for the plan year 01/01/2019 to 12/31/2019. Natera had billed Connecticare $3,900 for Pathology services and $4,100 for Laboratory services in connection with the Panorama panel. Connecticare denied the claim entirely, transferring potentially the entire charge onto Copley.

40.     After receiving the EOB, Copley's husband, Charles Copley, called Connecticare inquiring about the charge. Connecticare advised him to call Natera.

41.     Charles Copley then called Natera inquiring about the charge. He informed the Natera representative to whom he spoke that he and his wife were completely unaware that they could be charged thousands of dollars for the Panorama panel, a situation vastly different from what Copley's OB/GYN's office had earlier represented to Copley about the cost of the test.

42.     The Natera representative responded by saying that Copley would be charged $249 for the test, thereby confirming the pricing that Copley had been told by her OB/GYN's office. The Natera representative never advised Copley or Copley's husband that her doctor's office was mistaken, had misspoken, or had otherwise given any incorrect information to Copley about Natera's prices.

43.     However, over a year and a half later, Natera sent Copley a bill dated July 9, 2021 for $721.10 for the very same test, more than double the amount communicated to Copley at her OB/GYN's office and later confirmed by Natera's representative. The bill was due on August 8, 2021.

AMENDED CLASS ACTION COMPLAINT

44.    After receiving the bill from Natera, Charles Copley called Natera again, and expressed that he thought he had already paid the bill.

45.    However, Natera sent Copley a second bill dated August 16, 2021 for $721.10, due upon receipt.

46.    Natera then sent Copley a third bill dated September 17, 2021 for $721.10, due upon receipt.  This bill stated that the bill was "past due," and further stated: "To prevent your account from going to a professional collections agency, please submit payment for the amount due immediately."

47.    In response to these bills, Copley made one payment of $50 to Natera by check, noting on the check that it was paid under protest.

48.    Copley later received a bill dated October 24, 2021 for $671.10, due immediately. This bill stated that it was a "final notice," and further stated: "To prevent your account from going to a professional collections agency, please submit payment for the amount due immediately."  While Copley disputes that she owes this amount to Natera, it is her understanding that Natera expects that she will pay this bill, and that it could be sent to collections at any time. Natera has not retracted this bill.

49.    All of the bills that Natera sent to Copley were sent from, and payable to, Natera at PO Box 399023, San Francisco CA 94139-9023.

50.    Based on Natera's conduct, i.e., the fact that Natera had a relationship with Plaintiff's former OB/GYN's office and sent Copley a bill, it is evident that Natera believed it was authorized to send Copley a bill and also believed that Copley was obligated to pay it.

51.    Had Copley been aware of the true price of the Panorama test and the amount she would have been charged by Natera, she would not have agreed to do the test at that time, and thus would not have paid Natera any money at all.

52.    Since Plaintiff's prior experience with Natera, Copley has become pregnant again and again underwent Natera testing recommended by her current OB/GYN. At her current OB/GYN's office, prior to undergoing the test on or about May 28, 2023, she received an information sheet stating that "maximum" cost for the Panorama test would be $249.

1  Nevertheless, on or about May 30, 2023, Copley received an email from Natera stating that her

2  "estimated out-of-pocket cost" would actually be $720-820.

3       53.    Plaintiff's current OB/GYN's office also deals directly with Natera, and has

4  likewise been told by Natera that the out-of-pocket cost to patients for Natera tests would not

5  exceed $249, confirming that this misrepresentation comes from Natera.

6  Plaintiff Rachel Calcaterra

7       54.    In February 2022, Calcaterra was recommended Natera testing by her OB/GYN,

8  located in Fort Myers, Florida.

9       55.    Prior to having her blood drawn, a midwife at Calcaterra's OB/GYN's office

10  handed Calcaterra a Natera brochure.

11       56.    The brochure stated: "If [Natera] estimate[s] your cost to exceed $249, we'll

12  contact you and you choose how you pay: insurance or cash."  It also said: "If we estimate your

13  cost to exceed $249 per test, we'll contact you to discuss cash pay options."  An insert inside the

14  brochure further said: "If your insurance does not cover genetic testing, the non-covered service

15  amount is $249."

16       57.    Both the brochure and the insert provided the contact information for Thomas

17  O'Brien, identified in the brochure as an account sales representative for Natera.  The brochure

18  listed Natera's San Carlos, California address under Mr. O'Brien's name, but gave his phone

19  number beginning with a 239- (Fort Meyers, Florida) area code.

20       58.    Based on the content of the brochure and insert, Calcaterra's OB/GYN's office

21  maintained a direct relationship with Natera.

22       59.    The brochure listed Natera's address as 201 Industrial Road, Suite 410, San

23  Carlos, CA 94070, and phone number as +1 650.249.9090.

24       60.    Based on the pricing information in the Natera brochure, Calcaterra decided to

25  undergo the Panorama and Horizon tests, and had her blood drawn for those tests on or about

26  February 22, 2022.

27       61.    Without contacting Calcaterra, Natera apparently submitted claims for the tests to

28  her insurer, which did not pay the entire cost of the tests.

62.     Natera then billed Calcaterra $10,505 for the Horizon test, which was adjusted down to an amount due of $749, in an invoice dated March 23, 2022.  Natera sent another invoice for this amount dated April 19, 2022.

63.     Natera also billed Calcaterra $8,000 for the Panorama test, which was adjusted down to an amount due of $212.54, in an invoice dated July 28, 2022.

64.     Both sets of bills were payable to Natera at PO Box 889023, Los Angeles, CA 90088-9023.

65.     Calcaterra called Natera to inform Natera that she thought the out-of-pocket price should be $249 for the Horizon test based on the written materials she had seen; however, the Natera representative to whom she spoke would not honor that price.

66.     Consequently, Calcaterra paid the entire balance of both bills, including $749 for the Horizon test.

67.     Had Calcaterra been aware of the true price of the Horizon test and the amount she would be charged by Natera, she would not have agreed to do the test at that time, and thus would not have paid Natera any money at all.

Other experiences

68.     Just like Plaintiffs, hundreds, if not thousands, of other people have had similar experiences with Natera's deceptive and unfair billing practices, and many have left reviews on websites including Yelp, Better Business Bureau ("BBB"), Reddit, and What to Expect.  These reviews mention Natera's conduct in concealing the price of Natera genetic tests; surprise balance billing patients after recovering a portion from third-party payors (i.e. insurance companies); misleading patients about their out-of-pocket costs for a Natera genetic test; making false statements regarding Natera's purported Price Transparency Program; and harassing patients by repeatedly sending bills even after they have paid Natera's "prompt pay" discount in exchange for the rest of charges being waived.

69.     Online reviews on Yelp (yelp.com/biz/natera-san-carlos, accessed on February 8, 2022 and September 14, 2022 and July 5, 2023) confirm that Natera's billing practices are consistent, longstanding, and affecting patients throughout the country.

a.    One Yelp reviewer, in a review dated June 26, 2020, wrote: "Terrible company who preys on vulnerable families. We received a bill for $1,590 despite our OBGYN saying the cost is $249 if insurance does not cover it. When we called customer support they confirmed that the rate was $249 but because we didn't respond within 30 days the pricing went up to $1,590. How is that even possible? Stay as far away as you can."

b.    Another Yelp reviewer, in a review dated July 7, 2021, wrote: "[W]hat Natera is doing takes the cake. They advertise this 'Price Transparency Program' and tell ordering providers that at most the test will cost us $249 if insurance doesn't pay. What they advertise is, someone checks the coverage/benefits, makes an estimate, and contacts the patient if it might be in their interest to pay self-pay at $249. What they ACTUALLY do is, per the authorization to file insurance you sign on the order, file your insurance and if your insurance pays they take that money and if your insurance leaves you more than $249 out-of-pocket you get a one-time offer for a prompt pay discount of $249, then they go back to trying to bill you the massive coinsurance. In our case insurance paid them over $2k and left us about $1800. They used that $1800 and the fact that my wife authorized insurance to be filed (in the event that it would be better for us than $249) to extort us for the additional $249."

c.    In a Yelp review dated January 13, 2022, a reviewer remarked: "Super funny how on the forms you fill out before sending in the sample says 'if your insurance doesn't cover the cost, your maximum payment will be $249', the. [sic] You get a bill in the mail that says you owe over $2700, but your insurance paid over $600 already. When I called and asked what happened the lady on the line goes, we can offer you the $249 deal, but you have to pay with a credit card now.[] Not sure why I still have to pay

$249 when they already stole over $600 from BCBS. Very strange, I'd like some answers from them, but no one speaks English on the hotline."

d.      Another Yelp reviewer wrote on December 22, 2022: "I have reported Natera to CMS for their deceptive billing practices after having received a surprise NIPT testing bill for $749 despite their website claiming that the out-of-pocket cost for the bloodwork was around $249 at the time. They billed my in-network insurance an egregious $3,900 for the bloodwork when I clicked the button 'Send to Insurance' instead of clicking the button to pay now. When you call the company, they claim that the initial $249 price was a 'promotional' price that has since expired."

70.     On Natera's Better Business Bureau ("BBB") profile (https://www.bbb.org/us/ca/san-carlos/profile/laboratory-research/natera-1116-537368/complaints, accessed on Oct. 27, 2021 and September 14, 2022 and July 5, 2023; and https://www.bbb.org/us/tx/austin/profile/laboratory-testing/natera-inc-0825-1000218084/complaints, accessed on October 9, 2023), patients' reported experiences are no different.

a.      One BBB reviewer wrote: "We were told by our fertility clinic for genetic testing out of pocket cost would be $200 each test which we had 2 done mine and my spouse. We were given a paper with this information and told the genetic testing company would contact us once talking to our insurance and [if] it was more than $200 we could do the self-pay option. Nobody ever contacted us and they billed each of our insurance over $14,000 and now insurance is stating we owe an upward of $7000. Nobody ever contacted us to tell us this and offer us the self-pay option……"

b.      Another BBB reviewer wrote on August 14, 2022:  "Was told the test would only cost $250 and that my insurance covers the cost 100%. 6 months later the charge is finally charged to my insurance for $3900. This charge was also denied through my insurance. Natera mislead me in the

cost and coverage of this testing. I was baited and taken advantage of to get me to agree to this test and now in stuck with a large [bill] I cannot afford to pay."

    c.    Another BBB reviewer wrote on June 27, 2023: "Assuming the bill that we received is legitimate (which I'm not sure it is) they waited `1.5 years to send us a bill that they said would be $249 if we paid it within 30 days of the invoice date, but $1,590 if we paid after that. We left the country before the bill arrived, a bit more than two weeks after the 'invoice date.' So, by the time we got back into the country and got our mail, we had already passed the 30 days. I am wondering if this is a scam because I can't imagine a legitimate company would do something like this."

    d.    Another BBB reviewer wrote on September 15, 2023: On April 12, 2023, I went . . . for an ob/gyn visit for my pregnancy. The doctor and nurse suggested I do a genetic screening though Natera because of my advanced maternal age. They gave me several pamphlets from Natera that state that "If we estimate your cost to exceed $249, we'll contact you and you choose how you pay: insurance or cash." The nurse also said that people who pay for the tests and don't have insurance never pay more than $249. . . . I didn't hear anything from Natera for several weeks. I finally looked at my insurance claims online and was shocked to see that Natera had billed Anthem BCBS $4,899.00 and Anthem had flagged most of it as out-of-network. Natera then sent me a bill for $749.00 . . . saying they had adjusted the amount down. I called them concerning this issue and emailed them but received no explanation for their lies or a possible resolution. They lied in the pamphlets saying they would contact me if it cost more than $249. They lied on their website and in the pamphlets saying they are in-network with my insurance. This fraudulent dishonesty is unacceptable.

AMENDED CLASS ACTION COMPLAINT

1   I want them to adjust my bill to $249 which is still double what other

2   companies charge for similar tests."

3   e.   Another BBB reviewer wrote on September 20, 2023: "On 5/31/2023 I

4   took a Natera Horizons test. My doctor told me it would [cost] $249 out-of-

5   pocket, but that I should go through insurance because it might be less. She

6   told me numerous times that under no circumstances would I be charged

7   more than $249. In August I got an Explanation of Benefits from my

8   insurance company saying that my anticipated cost was $1399.10. When I

9   called Natera, they refused to guarantee that I would not be charged more

10   than $249, but I should wait for my bill to come and call back. When I told

11   the doctor's . . . about this, they said that they have an agreement with

12   Natera and again told me that I would not have to pay more than $249. I

13   got the bill today (9/19/2023) and it was for $749. . . . It also seems like a

14   predatory business practice to tell people they can pay $249 if they pay out

15   of pocket, and then charge three times as much if they go through

16   insurance. Not everyone has the time to make these phone calls and be on

17   top of all these medical bills."

18   71.   The Capitol Forum, an investigative news organization located in Washington,

19   D.C., published an article on August 5, 2021, entitled "Natera: Experts Raise Concerns About

20   Size of Prompt Pay Discounts and Company Billing Practices."  This article discusses the

21   experience of multiple patients who were billed hundreds or thousands of dollars more than

22   Natera's advertised cash price of $249 for its tests.  The article noted that "Natera patients

23   interviewed by The Capitol Forum shared similar stories regarding Natera's price transparency

24   program and prompt payment discounts. All said that the amounts Natera charged both their

25   insurers and them were far above what they had initially been told by the company, and that

26   Natera sent almost daily emails reminding them to pay."  The article also referred to a "fertility

27   clinic in California," which had a "business relationship with Natera," and reported that the clinic

28   "'received a lot of complaints from patients regarding Natera's billing practices'" because Natera

17

AMENDED CLASS ACTION COMPLAINT

would improperly "'send a bill ranging from $600 to $1000 to both [the clinic] and the patient more than 50% of the time. . . . They harass the patient and they tell them the clinic hasn't paid and you need to pay the bill, calling and emailing them every day, even when [the clinic] already paid the bill sent to [the clinic].'"

72.    Patients generally encounter Natera's misrepresentations only before or during pregnancy. Due to the time it takes to carry a pregnancy to term, and the inherent contingencies involved in family planning, patients who have been harmed by Natera's misrepresentations cannot be sure if, or exactly when, they will encounter Natera's misrepresentations again. This is because patients may not choose to become pregnant again, but if they do, there is no guarantee of success, nor can it be predicted when a patient may become pregnant again, or attempt to become pregnant again. However, Natera's billing policies and practices will affect any patient who does become pregnant, or attempt to become pregnant, and undergo genetic testing through Natera.

73.    As described herein, Natera knows that the price of its tests is a material piece of information to patients, and intentionally deprives patients of this information.  Instead, Natera directly or indirectly falsely promises them a lower price, with the intention of inducing them to undergo its tests with the expectation of an affordable price, only to bill them for an egregiously higher amount at a time when they are already under considerable stress, to patients' financial harm and Natera's benefit.

74.    Given the circumstances described hereinabove, Defendant's misconduct is malicious, oppressive, and/or fraudulent.

75.    Defendant's conduct constitutes malice because it is intended by the Defendant to cause injury to the Plaintiffs and/or is despicable conduct which is carried on by the Defendant with a willful and conscious disregard of the rights or safety of others.

76.    Defendant's conduct constitutes oppression because it is despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.

77.    Defendant's conduct constitutes fraud because Defendant is committing an intentional misrepresentation, deceit, or concealment of a material fact known to the Defendant

1    with the intention on the part of the Defendant of thereby depriving a person of property or legal

2    rights or otherwise causing injury.

3         78.     Natera's deceptive billing practices, as alleged herein, continue through the present

4    day.

5    **Prior Litigation**

6         79.     On November 18, 2021, Copley filed a lawsuit against Natera in the United States

7    District Court for the Northern District of California (case no. 3:21-cv-08941), alleging

8    substantially the same conduct as alleged herein.  On May 8, 2023, that federal court dismissed

9    the complaint for lack of standing under Article III of the U.S. Constitution.  The decision

10   expressly did not address the merits of Plaintiff Copley's claims or Plaintiff Copley's statutory

11   standing, and was "without prejudice to being filed in state court."  ECF No. 64 at 1, 12.

12                        **CLASS ACTION ALLEGATIONS**

13        80.     Pursuant to California Code of Civil Procedure § 382, Plaintiffs bring this action

14   on behalf of a class of all persons in the United States who had a "Panorama," "Horizon,"

15   "Vistara," or "Spectrum" test performed by Natera, and were then billed more than $249 for that

16   test (the "Class").  Copley also brings this action pursuant to California Code of Civil Procedure

17   § 382, on behalf of a subclass of all persons in the State of Connecticut who had a "Panorama,"

18   "Horizon," "Vistara," or "Spectrum" test performed by Natera, and were then billed more than

19   $249 for that test (the "Connecticut Subclass").  Calcaterra also brings this action pursuant to

20   California Code of Civil Procedure § 382 behalf of a subclass of all persons in the State of Florida

21   who had a "Panorama," "Horizon," "Vistara," or "Spectrum" test performed by Natera, and were

22   then billed more than $249 for that test (the "Florida Subclass").[5]

23        81.     Upon completion of discovery with respect to scope of the Class, Plaintiffs reserve

24   the right to amend the Class definitions. Excluded from the Class are Defendant, its parents,

25   subsidiaries and affiliates, directors and officers, and members of their immediate families.

26

27

28   _____
     [5] Unless specifically indicated otherwise, all allegations below concerning the Class include and
     apply equally to the Subclasses.

82.     This action has been brought and may properly be maintained as a class action because there is a well-defined community of interest in the litigation, the proposed Class and Subclasses are ascertainable because the class definition uses objective terms that make the eventual identification of class members possible, and Plaintiffs are proper representatives of the putative Class and respective Subclasses.

83.     The members of the Class and Subclasses are so numerous that the joinder is impracticable. It is believed that at a minimum, thousands of persons across the United States, including in each of Connecticut and Florida, where the respective Plaintiffs reside and are domiciled, have received bills in excess of $249 from Natera for these genetic tests, and thousands more will continue to be subjected to these exorbitant bills if Defendant's practices are not stopped. The precise number of Class and Subclass members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. These members may be notified of the pendency of this action by mail, email, and/or publication through the distribution records of Defendant (and, to the extent applicable, third-party retailers and vendors).

84.     Plaintiffs' respective claims are typical of the claims of the Class and Subclass because they had a "Panorama," "Horizon," "Vistara," or "Spectrum" test performed by Natera, and were then billed more than $249 for that test.

85.     Plaintiffs will fairly and adequately represent and protect the interests of the other Class and Subclass members. Plaintiffs have no interests antagonistic to those of other Class and Subclass members. Plaintiffs are committed to the vigorous prosecution of this action and have retained counsel experienced in litigation of this nature.

86.     Common questions of law and fact exist as to all members of the Class and Subclasses and predominate over any questions affecting only individual members, including, but not limited to:

        a.     whether Defendant misrepresents its billing and pricing policy to patients, either directly or through patients' medical providers, through its brochures and other channels of marketing;

AMENDED CLASS ACTION COMPLAINT

b.    whether Defendant conceals the extremely high price it charges for its genetic panels, thereby deceiving class members into choosing to perform the genetic panels;

c.    whether Defendant's conduct constituted an unfair, unlawful, and/or fraudulent business practice in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.;

d.    whether Defendant's conduct violated the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq.;

e.    as to the Connecticut Subclass, whether Defendant's conduct violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a et seq.;

f.    as to the Florida Subclass, whether Defendant's conduct violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204(1);

g.    whether Defendant was unjustly enriched as a result of Defendant's conduct;

h.    whether Defendant's conduct damaged members of the Class and Subclasses and, if so, the measure of those damages;

i.    whether Plaintiffs and the Class are entitled to punitive damages; and

j.    whether Defendant's practices in connection with billing of its genetic panels should be enjoined.

87.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class and Subclass members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the respective Class and Subclass members to seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty which will be encountered in the management of this litigation that would preclude its maintenance as a class action.

1    88.    Class certification is also appropriate because the Defendant has acted on grounds

2    that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief

3    is appropriate respecting the Class as a whole.

4    89.    Class members have suffered and will suffer irreparable harm and damages as a

5    result of Defendant's wrongful conduct.

6

                                  **CAUSES OF ACTION**

7
                                 **FIRST CAUSE OF ACTION**
8                    **Violations of the California Unfair Competition Law**
                          **Cal. Bus. & Prof. Code §§ 17200, et seq.**
9                                **On Behalf of the Class**

10   90.    Plaintiffs hereby incorporate by reference all allegations made in the previous

11   paragraphs.

12   91.    Plaintiffs brings this claim individually and on behalf of the members of the Class

13   against Defendant.

14   92.    Plaintiffs assert this cause of action against Defendant for unlawful, unfair and

15   fraudulent business practices; and unfair, deceptive, untrue and misleading advertising, as defined

16   by California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. (the "UCL").

17   93.    Defendant's conduct violates the UCL, as the acts and practices of Defendant

18   constitute a common and continuing course of conduct by means of "unlawful" "unfair" and

19   "fraudulent" business acts or practices within the meaning of the UCL.

20   94.    Defendant's conduct is fraudulent, and thus amounts to unfair competition as set

21   forth in the UCL, in that Defendant conceals the price of its genetic tests and misrepresents the

22   price patients would potentially have to pay for its genetic tests. Such misrepresentations and

23   omissions are likely to deceive, and in fact have deceived, thousands of patients.

24   95.    Defendant's conduct is unlawful, and thus amounts to unfair competition as set

25   forth in the UCL, in that it violates, among other things, California Civil Code §§ 1572, 1709 and

26   1710, as well as California Business & Professions Code § 17500. As described above, Defendant

27   willfully deceived Plaintiffs and Class members by misrepresenting the price patients would

28   potentially have to pay for its genetic tests, concealing the amount it charges for its genetic tests,

and misrepresenting its billing practice with the intent to induce them to alter their positions to their injury. Defendant's representations were untrue and misleading and Defendant knew, or by exercising reasonable care should have known, such representations were untrue and misleading. Defendant disseminated these untrue and misleading representations as part of a plan or scheme with the intent not to sell its services as so marketed.  Defendant knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Class. Therefore, the Defendant acted with conscious disregard for the rights of Plaintiffs and members of the Class.

96.     Defendant's conduct is unfair, and thus amounts to unfair competition as set forth in the UCL, because its utility to Defendant, if any, is greatly outweighed by the harm it causes to Plaintiffs and members of the Class, and because it is immoral, unethical, oppressive, unscrupulous and substantially injurious to patients who end up with unexpected huge bills that cause severe financial distress.

97.     As a direct and proximate cause of Defendant's violations of the UCL, Plaintiffs and members of the Class suffered an injury in fact and have suffered monetary harm. Defendant, on the other hand, has been unjustly enriched and should be required to make restitution to Plaintiffs and the Class and/or disgorge its ill-gotten profits pursuant to Business & Professions Code § 17203.

98.     Defendant's unlawful, unfair, and fraudulent business practices, as described herein, present a continuing threat to Plaintiffs, the Class and the general public in that Defendant continues to misrepresent the price and out-of-pocket expenses that patients would have to bear for its genetic tests.

99.     A constructive trust should be imposed upon all wrongful or inequitable proceeds received by Defendant traceable to Plaintiffs and members of the Class.

100.    Plaintiffs and the Class seek equitable relief because they have no other adequate remedy at law. Absent equitable relief, Defendant will continue to injure consumers, and harm the public's interest, thus engendering a multiplicity of judicial proceedings.

101.    Plaintiffs further seek an order enjoining Defendant from engaging in any unlawful or inequitable acts and practices as alleged herein, because of Defendant's continuing misrepresentations and improper billing practices.

**SECOND CAUSE OF ACTION**
**Violations of the California Consumer Legal Remedies Act**
**Cal. Civ. Code §§ 1750, et seq.**
**On Behalf of the Class**

102.    Plaintiffs hereby incorporate by reference all allegations made in the previous paragraphs.

103.    Plaintiffs brings this claim individually and on behalf of the members of the Class against Defendant.

104.    The conduct of Defendant alleged above constitutes an unfair method of competition and unfair or deceptive act or practice in violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq. ("CLRA").

105.    Defendant is a person as defined by Cal. Civ. Code § 1761(c).

106.    Plaintiffs and Class members are consumers as defined by Cal. Civ. Code § 1761(d).

107.    Defendant's genetic testing services described above constitutes a service as defined by Cal. Civ. Code § 1761(b).

108.    Plaintiffs' purchases were a transaction under Cal. Civ. Code § 1761(e).

109.    The CLRA prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale . . . of services to any consumer," which, among other instances enumerated in the CLRA, include: "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have …." (§ 1770(a)(5)); "Advertising goods or services with intent not to sell them as advertised" (§ 1770(a)(9)); or "a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law" (§ 1770(a)(14)).

110.    Defendant violated Cal. Civ. Code § 1770(a)(5) by misrepresenting that its genetic testing services have the characteristics of price transparency and a maximum out-of-pocket cost of $249, which in fact they do not.

111.    Defendant violated Cal. Civ. Code § 1770(a)(9) by falsely advertising its genetic testing services to be affordable and price transparent; and falsely advertising that it would offer patients the option of paying a discounted cash discount price of $249; and falsely advertising a maximum out-of-pocket cost of $249.

112.    Defendant violated Cal. Civ. Code § 1770(a)(13), by making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions of its tests to $249.

113.    Defendant violated Cal. Civ. Code § 1770(a)(14) by representing that its transactions with patients involve rights and obligations regarding price transparency and a maximum out-of-pocket cost of $249 which, in fact, they do not have or involve.

114.    Defendant violated Cal. Civ. Code § 1770(a)(16) by representing that its tests have been supplied in accordance with a previous representation about price transparency and a maximum out-of-pocket cost of $249, when they have not.

115.    The representations and omissions set forth above are of material facts that a reasonable person would have considered important in deciding whether or not to purchase Defendant's services. Plaintiffs and Class members justifiably acted or relied upon Defendant's misrepresentations and omissions to their detriment.

116.    Plaintiffs and the other members of the Class have been, and continue to be, injured as a direct and proximate result of Defendant's violations of the CLRA.

117.    Plaintiffs are entitled to pursue a claim against Defendant on behalf of the Class to enjoin Defendant from continuing its unfair or deceptive acts or practices under Cal. Civ. Code § 1780(a) and § 1781, as well as to pursue costs and attorneys' fees under § 1780(e).

118.    On November 19, 2021, Copley served Defendant with written notice of its CLRA violations pursuant to Cal. Civ. Code § 1782, via letter sent by certified mail, return receipt requested. After the requisite thirty days, Defendant failed to respond to this CLRA notice letter,

1  and did not make any appropriate correction, repair, replacement, or other remedy.  On

2  September 8, 2023, Copley and Calcaterra served Defendant with further written notice of its

3  CLRA violations pursuant to Cal. Civ. Code § 1782, via letter sent by certified mail, return

4  receipt requested. After the requisite thirty days, Defendant failed to respond to this CLRA notice

5  letter, and did not make any appropriate correction, repair, replacement, or other remedy.

6  Pursuant to Cal. Civ. Code § 1782, Plaintiffs are thus entitled to seek damages at this time.

7  Accordingly, Plaintiffs seeks damages on behalf of themselves and the Class as permitted by Cal.

8  Civ. Code § 1782.

9  **THIRD CAUSE OF ACTION**
**Breach of Implied Contract or Quasi-Contract**
10  **On Behalf of the Class**

11      119.    Plaintiffs hereby incorporate by reference all allegations made in the previous

12  paragraphs.

13      120.    Plaintiffs brings this claim individually and on behalf of the members of the Class

14  against Defendant.

15      121.    A contract is implied by law between the Defendant and the Plaintiffs and Class

16  members, entitling Plaintiffs and Class members an accurate representation of the charges for

17  Defendant's services.

18      122.    A contract is also implied by law between the Defendant and the Plaintiffs and

19  Class members, entitling Defendant to fair market or reasonable value of the testing services

20  rendered (the quantum meruit of the services performed).

21      123.    Defendant breached the terms of the implied contract by billing Plaintiffs and

22  Class members at excessive rates, much higher than reasonable value implied in law, which

23  Plaintiffs and Class members were completely unaware of.

24      124.    By means of Defendant's wrongful conduct alleged herein, Defendant knowingly

25  misrepresented the charges for its genetic tests in a manner that was unfair, unconscionable and

26  oppressive, and knowing the charges would have had an influence in the consumers' decision to

27  purchase the service.

28

125.    As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

126.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of charges upon members of the Class in an unfair, unconscionable, and oppressive manner. Defendant's retention of such funds, under circumstances making it inequitable to do so, constitutes unjust enrichment.

127.    Defendant knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Class. Therefore, the Defendant acted with conscious disregard for the rights of Plaintiffs and members of the Class.

128.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

129.    The financial benefits derived by Defendant rightfully belong to Plaintiffs and members of the Class. Defendant should be compelled to provide restitution, and to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and the Class, all proceeds received from Plaintiffs and the Class as a result of any unlawful or inequitable act described herein that unjustly enriched Defendant.

130.    A constructive trust should be imposed upon all wrongful or inequitable proceeds received by Defendant traceable to Plaintiffs and members of the Class.

131.    Plaintiffs further seek an order enjoining Defendant from engaging in any unlawful or inequitable acts and practices as alleged herein, because of Defendant's continuing misrepresentations and improper billing practices.

132.    Plaintiffs and members of the Class have no adequate remedy at law.

**FOURTH CAUSE OF ACTION**
**Violations of the Connecticut Unfair Trade Practices Act**
**Conn. Gen. Stat. § 42-110b(a)**
**On Behalf of the Connecticut Subclass**

133.    Copley hereby incorporates by reference all allegations made in the previous paragraphs.

134.    Copley brings this claim individually and on behalf of the members of the Connecticut Subclass against Defendant.

135.    The Connecticut Unfair Trade Practices Act ("CUTPA") prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

136.    Defendant's conduct violates the CUTPA because it (1) offends public policy as it has been established by statutes, the common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; and (3) causes substantial injury to consumers.

137.    Defendant further violated the CUTPA by failing to make advertised items conspicuously and readily available for sale at or below the advertised prices.  Regs., Conn. State Agencies § 42-110b-18(i).

138.    Copley, on behalf of herself and the Connecticut Subclass, seeks damages, punitive damages, injunctive relief, other equitable relief, costs, and attorneys' fees as permitted by Conn. Gen. Stat. § 42-110g.

**FIFTH CAUSE OF ACTION**
**Violations of the Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. § 501.204(1)**
**On Behalf of the Florida Subclass**

139.    Calcaterra hereby incorporates by reference all allegations made in the previous paragraphs.

140.    Calcaterra brings this claim individually and on behalf of the members of the Florida Subclass against Defendant.

141.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

142.    Defendant violated the FDUTPA because Defendant's conduct as alleged herein was likely to deceive a consumer acting reasonably in the same circumstances, and that conduct caused actual damages to Calcaterra and members of the Florida Subclass.

143.    Calcaterra, on behalf of herself and the Florida Subclass, seeks damages, injunctive relief, other equitable relief, costs, and attorneys' fees as permitted by Fla. Stat. § 501.211 and § 501.2105.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request that the Court award the following relief:

    a.    Certify this action as a class action pursuant to California Code of Civil Procedure § 382, appoint Plaintiffs as representative of the Class and their respective Subclasses, and designate the undersigned as Class Counsel;

    b.    Declare Defendant's conduct unlawful and enter an order enjoining the Defendant from continuing to engage in the conduct alleged herein;

    c.    Award Plaintiffs and the Class damages, including punitive damages pursuant to Cal. Civ. Code 3294 (and/or to the Connecticut Subclass pursuant to Conn. Gen. Stat. § 42-110g);

    d.    Award Plaintiffs and the Class restitution and/or disgorgement to the extent legal remedies are unavailable or insufficient;

    e.    Award pre-judgment and post-judgment interest;

    f.    Grant Plaintiffs and the Class payment of the costs of prosecuting this action, including expert fees and expenses;

    g.    Grant Plaintiffs and the Class payment of reasonable attorneys' fees; and

    h.    Grant such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs and the Class members demand a trial by jury on all triable issues.

///

///

///

AMENDED CLASS ACTION COMPLAINT

DATED: November 8, 2023

Respectfully submitted,

**BERMAN TABACCO**

By: ___*/s/ Alexander S. Vahdat*___
Alexander S. Vahdat

Joseph J. Tabacco, Jr.
Kristin J. Moody
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: jtabacco@bermantabacco.com
         kmoody@bermantabacco.com
         avahdat@bermantabacco.com

*Attorneys for Plaintiffs and the Proposed Class*

Patricia Avery (admission *pro hac vice to be filed*)
Philip M. Black (SBN 308619)
**WOLF POPPER LLP**
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Facsimile: (212) 486-2093
Email: pavery@wolfpopper.com

*Attorneys for Plaintiffs and the Proposed Class*

30